Matter of McCabe v 511 W. 232nd Owners Corp. (2024 NY Slip Op 06290)

Matter of McCabe v 511 W. 232nd Owners Corp.

2024 NY Slip Op 06290

Decided on December 17, 2024

Court of Appeals

Halligan, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the Official Reports.

Decided on December 17, 2024

No. 91

[*1]In the Matter of Maryann McCabe et al., Appellants,
v
511 West 232nd Owners Corp., Respondent.

Yoram Silagy, for appellants.
Michelle P. Quinn, for respondent.

HALLIGAN, J.

:
Petitioner Maryanne McCabe resided for 13 years in a New York City cooperative building with her "long-time romantic partner," David Burrows. Upon Burrows' death, he willed his real property, including his unit in the building, to petitioner, who then sought to acquire his lease and shares under a lease provision authorizing an automatic transfer to a shareholder's "spouse." The cooperative board declined to treat petitioner as a spouse but offered to consider whether she could retain the lease and shares under a clause covering a shareholder's family member. Petitioner argues that the board's failure to treat her as a spouse for purposes of the automatic transfer provision violated the prohibition against discrimination on the basis of marital status under the New York City Human Rights Law (NYCHRL) (see Administrative Code of City of New York § 8-107 [5]). We disagree.
We have interpreted the term "marital status" as used in the state and city human rights laws in several prior decisions (see Matter of Manhattan Pizza Hut, Inc. v New York State Human Rights Appeal Bd., 51 NY2d 506, 511-512 [1980] [State Human Rights Law]; Hudson View Props. v Weiss, 59 NY2d 733, 735 [1983] [NYCHRL and State Human Rights Laws]; Levin v Yeshiva Univ., 96 NY2d 484, 490-491 [2001] [same]). Amendments to the NYCHRL that postdate those decisions direct that the statute "shall be construed liberally for the accomplishment of the uniquely broad and remedial purposes thereof, regardless of whether federal or New York state civil and human rights laws, including those laws with provisions worded comparably to provisions of this title, have been so construed" (Administrative Code of City of New York § 8-130 [a]). Approaching this question of statutory interpretation with that instruction in mind, we conclude that petitioner's proposed reading of "marital status" does not comport with the ordinary meaning of the phrase, the structure of the NYCHRL, or the legislative history of the provision. We therefore affirm.
This matter arises from a dispute over ownership of the lease and shares for an apartment in a New York City cooperative, 511 West 232nd Owners Corporation. The lease and shares were held in the name of David Burrows, who resided in the apartment with petitioner from 2006 until his death in 2019. Petitioner owns a separate unit in the building. In 2018, Burrows and petitioner asked the cooperative's board to add petitioner as a shareholder and tenant of his unit. In response, the board requested a marriage license, domestic partnership certificate, or other proof that petitioner was Burrows' spouse, citing paragraph 16 (a) (vi) of the lease. That provision states:
"Except in the case of an assignment, transfer or bequest to the Lessee's spouse of the shares and this Lease . . . consent to such assignment shall have been authorized by resolution [of] the Directors, or given in writing by a majority of the Directors; or, if the Directors [do not consent within 30 days], then by Lessees owning of record at least two-thirds (2/3) of the then issued shares . . . ."
The two were neither married nor in a registered domestic partnership, and petitioner was never [*2]added as a shareholder of his unit. Burrows bequeathed his apartment to petitioner when he passed away in June 2019.
On February 4, 2020, the board served petitioner with notice to cure and vacate the unit on the ground that the shareholder of record was deceased and petitioner was occupying the apartment without the cooperative's consent. The board invited petitioner to provide evidence demonstrating that she was Burrows' family member and to complete a request for assignment of Burrows' shares. Petitioner responded by asserting that she was entitled to assignment of the shares under paragraph 16 (b) of the lease, which states:
If the Lessee shall die, consent shall not be unreasonably withheld or delayed to an assignment of the lease and shares to a financially responsible member of the Lessee's family (other than the Lessee's spouse as to whom no consent is required).
Petitioner explained that she and Burrows had lived together as partners in the apartment since 2006, and asked the board to inform her of any specific documents they needed as proof of their long-term relationship. The board responded by again noting that under paragraph 16 (b) of the lease, petitioner was required to show she was Burrows' spouse or a financially responsible family member. When petitioner did not supply a marriage license, registration of a domestic partnership, or evidence showing that she was a family member, the board invited her to apply for a transfer of shares in the same manner as a prospective purchaser. Petitioner submitted the required application materials, but the board ultimately rejected her application.
Petitioner brought a CPLR article 78 proceeding challenging the board's refusal to transfer the lease and shares as violative of the NYCHRL's prohibition on marital status discrimination (see Administrative Code § 8-107 [5]), as well as the New York State Human Rights Law (see Executive Law § 295 [5]) and the Federal Fair Housing Act and Civil Rights Act of 1964. Petitioner alleged that she was the "equivalent of a spouse," and that the board had discriminated against her because of her marital status by refusing to treat her as a spouse. The board responded that petitioner was not a spouse and thus not entitled to an automatic transfer of shares, and that although petitioner did not claim to be a family member, even if she were so considered, she had not established that she was financially responsible as required by the lease.
Supreme Court denied the petition and dismissed the proceeding. The court reasoned that the automatic transfer request had been denied not because petitioner was unmarried, but because she was unmarried to a particular person (Burrows), and that did not constitute marital status discrimination under Levin (96 NY2d 484) and Hudson View (59 NY2d 733). Supreme Court further held that petitioner had not established she was a family member, and that even if she had, the board had sufficient grounds for rejecting her application.
Before the Appellate Division, petitioner sought reversal only on the ground that she was the equivalent of Burrows' spouse. The Appellate Division affirmed on the same grounds set forth by Supreme Court (214 AD3d 564 [1st Dept 2023]). This Court granted leave to appeal (40 NY3d 904 [2023]), and we now affirm.
 
The question before us is whether the board discriminated against petitioner on the basis of her marital status in violation of the NYCHRL by refusing to treat her as a "spouse" for purposes of the cooperative's lease. We begin by considering our precedent interpreting the term "marital status."
We first considered the meaning of "marital status" under the state human rights law (NYSHRL) in Manhattan Pizza Hut, a case challenging an anti-nepotism rule (see 51 NY2d 506 [analyzing former Executive Law § 296]). We explained that "the plain and ordinary meaning of 'marital status' is the social condition enjoyed by an individual by reason of his or her having participated or failed to participate in a marriage" (id. at 510). Thus, "the statute in effect says that employers may no longer decide whether to hire, fire, or promote someone because he or she is single, married, divorced, separated or the like" (id. at 512). Because marital status "would not be expected to include an identification of one's . . . spouse and certainly not the spouse's occupation," we concluded that firing an employee for being married to her supervisor was not marital status discrimination (id. at 514).
In subsequent decisions, we interpreted marital status identically under both the state and local human rights laws, without considering whether the statutes might differ in scope (see Hudson View, 59 NY2d at 735; Levin, 96 NY2d at 490-491). In Hudson View, we held that limiting occupancy to a tenant and members of her immediate family was not marital status discrimination under either the state or city statutes (59 NY2d at 735). The basis for the landlord's action there, we explained, was not that the tenant was unmarried, but that the tenant admittedly had a non-family member living with her (id.). In Levin, we held that restricting cohabitational housing eligibility to students, their spouses, and their dependent children was not marital status discrimination under the state or city laws, reasoning that "a distinction must be made between . . . marital status as such, and the existence of [a] disqualifying relationship—or absence thereof—with another person" (96 NY2d at 490-491).
Following these decisions, the City Council amended the NYCHRL in 2005 and again in 2016 to clarify that the law serves a "uniquely broad and remedial purpose" (Local Law No. 85 [2005] of City of New York § 7; Local Law No. 35 [2016] of City of New York § 2). Both amendments expressly instruct that the city law should not be interpreted in lockstep with comparably worded state or federal law protections, and the legislative history of the 2016 amendment underscores this point (Rep of Governmental Affairs Div, Comm on Civ Rights at 10-11, March 8, 2016, Local Law No. 35 [2016] of City of NY, citing Williams, 61 AD3d 62, 67-68 [1st Dept 2009]). At the same time, "any such broad construction must be reasonable and grounded in the language of the local law" (Doe v Bloomberg L.P., 36 NY3d 450, 462 [2021]). "Even if the NYCHRL was intended to be more protective than the state and federal counterparts, and even if its legislative history contemplates that the Law be independently construed with the aim of making it the most progressive in the nation, the NYCHRL still must be interpreted based on its plain meaning" (Makinen v City of New York, 30 NY3d 81, 88 [2017] [internal citations and quotation marks omitted]).
Given that we have not interpreted the term marital status as used in the NYCHRL since passage of the Restoration Act and the 2016 amendments, we now take a fresh look at its meaning.
We begin with the text and structure of the statute. The NYCHRL makes it an unlawful practice, among other things, "to discriminate against any [] person or persons in the terms, conditions or privileges of the sale, rental or lease of any such housing accommodation or an interest therein" "because of the actual or perceived race, creed, color, national origin, gender, age, disability, sexual orientation, uniformed service, height, weight, marital status, partnership status, or immigration or citizenship status of any person or group of persons . . . ." (Administrative Code § 8-107 [5] [a] [1]).
Petitioner's argument hinges on the definition of the term "marital status" as used in this provision. She argues that the prohibition on discrimination based on marital status requires the board to accord her the same rights under the lease as if she were Burrows' "spouse" because she is the "equivalent of a spouse." In this regard, petitioner's claim is different from a marital status discrimination claim brought by someone denied access to housing (or, as set forth in other provisions of the NYCHRL, employment) because the individual is single, married, divorced, or widowed (see e.g. Manhattan Pizza Hut, 51 NY2d 506). Petitioner instead argues that the board's refusal to treat her as Burrows' spouse because she was not married to him constitutes marital status discrimination.
The NYCHRL does not define "marital status," but Black's Law Dictionary defines it as "[t]he condition of being single, married, legally separated, divorced, or widowed" (Black's Law Dictionary [12th ed 2024], marital status). Along the same lines is the general understanding: "when one is queried about one's 'marital status,' the usual and complete answer would be expected to be a choice among 'married,' 'single,' etc." (Manhattan Pizza Hut, 51 NY2d at 511-512). A plain reading of the term, then, is that marital status reflects the legal condition of being single, married, legally separated, divorced, or widowed. Marital status turns on whether an individual has "participated or failed to participate in a marriage," and is distinct from "the identity or situation of the individual's spouse" (id.).
This reading comports with how the term was initially understood. Marital status was added to the list of protected classifications in 1973 (see Local Law No. 7 [1973] of City of New York § 3). In a statement before the City Council, the New York Attorney General explained that the provision was included to address the problem that "many single persons in New York City have been refused housing accommodations merely because of their status as single persons . . . . Landlords have a right to insist that applicants for apartments have the necessary financial means to afford their apartments. But such decision should be based on individual consideration of each applicant's background, rather than on stereotyped characterizations based on an applicant's sex or marital status" (Statement of NY State Attorney General before the New York City Council, Oct. 3, 1972, Local Law Bill Jacket, Local Law No. 7 [1973] of City of NY at 35-36). Those remarks indicate that "marital status" refers to whether a person is participating in a marriage, not the nature of one's relationship with another specific person.
Three other provisions of the NYCHRL reinforce this understanding. First, the 2005 amendments added "partnership status" to the list of classes protected from discrimination under the NYCHRL (Local Law No. 85 [2005] of City of New York §§ 2-3). Partnership status is defined as "the status of being in a domestic partnership, as defined by subdivision a of section 3-240" (Administrative Code of City of New York § 8-102). Section 3-240 of the Code, in turn, defines "domestic partners" as "persons who have a registered domestic partnership," including "persons who are members of a marriage that is not recognized by the state of New York, domestic partnership, or civil union, lawfully entered into in another jurisdiction" (Administrative Code of City of New York § 3-240).
The domestic partnership amendment suggests that the City Council did not understand the bar on "marital status" discrimination to cover unmarried couples at the time it passed that amendment. If it did, then presumably a couple who had registered as domestic partners would already be covered, as would an unmarried couple who had not registered as domestic partners, and there would have been no need for the amendment. But although the domestic partner registry was created in 1993 to extend "unmarried heterosexual and homosexual couples in New York City some of the rights enjoyed by married couples" (Alan Finder, Rights of 'Domestic Partners' Broadened by Dinkins Order, NY Times, Jan. 8, 1993, § A at 1, col 2; see also NY City Executive Order [Dinkins] No. 48; [*3]NY City Executive Order [Dinkins] No. 49), the Appellate Division held that the NYCHRL did not protect couples who were domestic partners (see e.g. Funderburke v Uniondale Union Free Sch. Dist. No. 15, 251 AD2d 622 [2d Dept 1998]). Chief Judge Wilson offers an alternative account of this amendment, speculating that the City Council might have added domestic partnership status to protect against discrimination targeted specifically at a couple in a domestic partnership, to the exclusion of married couples or unmarried couples who have not registered as domestic partners (see Wilson, Ch. J., dissenting op at 6-8), but the legislative history of this amendment does not support this view. Rather, the point is, as Judge Rivera explains in dissent, that both the "partnership status" and "marital status" classifications "legally recognize an intimate relationship" (Rivera, J., dissenting op at 18). The City Council has, to date, confined statutory protections to legally recognized relationships, and has given no indication they should extend further.[FN1]
Additionally, the City Council added a provision in 2016 that prohibits discrimination based on "caregiver status" (Local Law No. 1 [2016] of City of New York §§ 1-3). This amendment defined a "covered relative" (a type of "care recipient" for purposes of the Code) as "a caregiver's child, spouse, domestic partner, parent, sibling, grandchild or grandparent, or the child or parent of the caregiver's spouse or domestic partner, or any other individual in a familial relationship with the caregiver as designated by the rules of the commission" (Administrative Code § 8-102). The detailed list of covered persons shows that the City Council considered a range of different relationships relevant to the scope of anti-discrimination protection and delineated them with specificity—something that it did not do for persons who were in a romantic relationship with another individual but not married or domestic partners. Along the same lines is a provision that bars discrimination because of the "actual or perceived race, creed, color, national origin, disability, age, sexual orientation, uniformed service or immigration or citizenship status of a person with whom such person has a known relationship or association" (Administrative Code of City of New York § 8-107 [20]).
Judge Rivera's reliance on our decision in Braschi v Stahl Assoc. Co. (74 NY2d 201 [1989]) (see Rivera, J., dissenting op at 25), is unavailing. There, we set forth factors for determining whether someone is "family" as that term is used in the New York City rent regulation laws. We contrasted the term "family," which we held "includes two adult lifetime partners whose relationship is long term and characterized by an emotional and financial commitment and interdependence," with "people who have formalized their relationship by obtaining . . . a marriage certificate" (id. at 211). That legal formality is precisely what defines a spouse as distinct from other relationships. Petitioner might well qualify as "family" under the Braschi test, and she was in fact treated as such by the board.
The Chief Judge reads the text of section 8-107 (5) differently, taking the view that the statutory prohibition of "marital status" discrimination includes all couples for purposes of housing discrimination, but not for discrimination in employment or public accommodations (see Wilson, Ch. J., dissenting op at 3-5). For starters, the distinction the Chief would draw between housing and employment discrimination is at odds with his reliance on Funderburke, an employment discrimination case (id. at 6, citing 251 AD2d at 623). More to the point, it would be quite unusual for the legislature to use the same words in the same statute, but intend for them to have different [*4]meanings. Our dissenting colleague brushes aside this bedrock assumption by pointing to the inclusion of the phrase "group of persons" in the prohibition against housing discrimination (Wilson, Ch. J., dissenting op at 3; see also Administrative Code § 8-107 [5] [a] [1]). But the phrase "group of persons" was part of the NYCHRL as originally enacted in 1965 (Local Law No. 97 [1965] of the City of New York § 1-7.0 [2]-[3]), well before the bar on "marital status" discrimination was added in 1973 (Local Law No. 7 [1973] of the City of New York). Thus, we cannot read "group of persons" as giving a different meaning to the later-enacted ban on "marital status" discrimination.[FN2]
We also disagree with the Chief's reading for another reason. It suggests that the phrase "person or group of persons" modifies "marital status" specifically, to extend protection to unmarried, unregistered partners. But the phrase actually modifies all of the categories protected by the NYCHRL (see Administrative Code § 8-107 [5] [a] [1]). Neither the legislative history nor our case law offers guidance on what "group of persons" means, but it must apply equally to each of these categories since the statute does not tether the phrase to "marital status" alone.
Petitioner and Judge Rivera in dissent place great weight on section 8-130's directive to construe the text of the NYCHRL broadly and any exemptions narrowly (see Rivera, J., dissenting op at 2, 9, 10, 13, 18-20, 25-26; see also Administrative Code § 8-130; Albunio v City of New York, 16 NY3d 472, 478 [2011] [the NYCHRL should be construed as broadly as "reasonably possible"]). We adhere to this instruction, but conclude it does not compel reading the term "marital status" to cover petitioner's claim.
Section 8-130 was amended in 2005 to mandate that the NYCHRL be construed to accomplish its "uniquely broad and remedial purposes . . . regardless of whether federal or New York State civil and human rights laws, including those laws with provisions comparably-worded to provisions of this title have been so construed" (Local Law No. 85 [2005] of City of New York § 7). Such similarly worded provisions, the amendment instructed, should be viewed "as a floor below which the City's Human Rights Law cannot fall, rather than a ceiling above which the local law cannot rise" (id. § 1). As explained above, our analysis is consistent with that mandate.
In 2016, the City Council again amended section 8-130 to "provide additional guidance for the development of an independent body of jurisprudence for the [NYCHRL] that is maximally protective of civil rights in all circumstances" (Local Law No. 35 [2016] of City of New York § 1). To that end, it instructed that "[e]xceptions to and exemptions from the provisions of this title [should] be construed narrowly in order to maximize deterrence of discriminatory conduct," and identified three cases that "have correctly understood and analyzed the requirement . . . that all provisions of the [NYCHRL] be liberally and independently construed" (id. § 2, citing Albunio, 16 NY3d 472; Bennett v Health Mgt. Sys., Inc., 92 AD3d 29 [1st Dept 2011]; and Williams v New York City Hous. Auth., 61 AD3d 62 [1st Dept 2009]). Each of these cases considered the appropriate standard for evaluating a discrete aspect of a discrimination claim—in Williams, whether harassment must be severe and pervasive (61 AD3d 62); in Bennett, when evidence of pretext allowed a case to proceed to trial (92 AD3d 29); and in Albunio, whether implicit opposition to discrimination was sufficient to support a retaliation claim (16 NY3d 472). Here, by contrast, petitioner seeks to [*5]redefine an entire category of prohibited discrimination.
The legislative history of the 2005 amendments contains individual remarks by one City Council member and one non-Council testifying witness suggesting that Levin no longer remains good law (see Morse v Fidessa Corp., 165 AD3d 61, 64-67, 70-72 [1st Dept 2018]; Minutes of the Stated Council Meeting, NY City Council, Sept. 15, 2005 at 41:11-16 [testimony of Annabel Palma, council member and proponent of the local law]; Minutes of the Comm on General Welfare, NY City Council, Sept. 22, 2004 at 29:3-14 [testimony of Craig Gurian, Director of the Anti-Discrimination Center of Metro N.Y., and proponent of the proposed local law]). However, a colloquy between the Chairman of the Committee on General Welfare and the Deputy Commissioner for the New York City Commission on Human Rights suggests that the Council intended inclusion of "partnership status" as its response to Levin (Minutes of the Comm on General Welfare, NY City Council, Sept. 22, 2004 at 70:22-75:25)[FN3]. In any event, the comments regarding Levin are not sufficient for us to conclude that the City Council intended its amendment to section 8-130 to mandate a new, novel understanding of marital status discrimination, and we have previously rejected the suggestion that such discrete comments can bear the weight of legislatively overruling our precedent (see Russell v New York University, — NY3d — , 2024 NY Slip Op 02226, *4 n 4 [2024]).[FN4]
Nor does our holding today address whether the 2005 and 2016 enactments would yield a different result for a plaintiff similarly situated to the petitioner in Levin. Chief Judge Kaye noted in Levin that each of the plaintiffs in that case "were not denied partner housing because of their relationship to any particular person, . . . [r]ather, they were denied partner housing merely because they were unmarried" (96 NY2d at 502 [Kaye, Ch. J., concurring in part]; see also Hunter v Debmar-Mercury LLC, 2023 WL 5671527, *15 n 5 [SD NY Sept. 1, 2023, No. 22 Civ. 1687] ["Levin says nothing about discrimination premised on the individual to whom someone is or is not married"]). Here, petitioner herself owned a unit in the same building. She was not denied an automatic transfer of Burrows' unit merely because she was unmarried, but because of her relationship to a particular [*6]person—specifically, because she was not married to Burrows.[FN5]
The frequency with which the City Council has revised the NYCHRL reflects its consistent, careful consideration of the statute's scope over the years. It amended what was originally a housing anti-discrimination bill first to include protections against employment discrimination and to charge the New York City Human Rights Commission with enforcement (see Local Law No. 97 [1965] of City of New York), and then to add a prohibition against discrimination because of sex or marital status (see Local Law No. 7 [1973] of City of New York). Between 2005 and 2016, the City Council amended the NYCHRL more than twenty times to add, among other changes, prohibitions on discrimination because of unemployment (see Local Law No. 14 [2013] of City of New York), pregnancy (see Local Law No. 78 [2013] of City of New York), consumer credit history (see Local Law No. 37 [2015] of City of New York), and caregiver status (see Local Law No. 1 [2016] of City of New York). Given this history, had the Council intended to require that marital status be extended to cover discrimination based on one's relationship to another, we assume it would have amended the statute to say exactly that.
In fact, the Council did consider expanding the NYCHRL in a manner that may have encompassed petitioner's claims, but it declined to do so based on concerns about the breadth of such protection. In 2003 and again in 2004, the Council's Committee on General Welfare debated an amendment that would have defined marital status as "referring both to the marital status of a person in isolation, and to the marital status of a person in relation to another person" (Proposed Legislation to Administrative Code, NY City Council, Comm on Gen Welfare, Int. No. 439 [Apr. 30, 2003]; Proposed Legislation to Administrative Code, NY City Council, Comm on Gen Welfare, Int. No. 22 [Sept. 22, 2004]). The Commissioner of the NYC Commission on Human Rights opposed the adoption of this language, warning that it would "have the unintended consequence of protecting individuals who are not involved in the type of relationships that the . . . City Council is seeking to protect" (Minutes of the Comm on General Welfare, NY City Council, Sept. 22, 2004 at 60:3-62:16). In the face of objections to expanding coverage in this manner (Minutes of the Comm on Gen. Welfare, NY City Council, Oct. 16, 2003 at 22:12-23:5; Minutes of the Comm on General Welfare, NY City Council, Sept. 22, 2004 at 60:3-62:16), the effort was abandoned.
Nothing in Bostock requires a different result (see Rivera, J., dissenting op at 20-24, citing Bostock v Clayton County, 590 US 644, 666 [2020]). Bostock explains that "[w]hen the express terms of a statute give us one answer and extratextual considerations suggest another, it's no contest" (id. at 653). Our focus on the common understanding of the term "marital status" and other provisions included in the statute that shed light on its meaning is not extratextual. Just the opposite, it is grounded in the text. As for our consideration of the City Council's decision not to expand marital status protection, we agree that it may be difficult to determine why a legislative body declines to [*7]take an action, but "[w]hen the Legislature, with presumed knowledge of the judicial construction of a statute, forgoes specific invitations and requests to amend its provisions to effect a different result, we have construed that to be some manifestation of legislative approbation of the judicial interpretation" (see Desrosiers v Perry Ellis Menswear, LLC, 30 NY3d 488, 497 [2017] [internal citation and quotation marks omitted]).
The City Council has broadened the scope of the NYCHRL on numerous occasions, and it could amend the statute to protect persons in petitioner's situation. But the task of identifying appropriate metrics for assessing which relationships are sufficiently equivalent to a marriage to warrant protection, determining the scope of protection and any appropriate exemptions, and weighing the consequences of such a change—a project that neither the petitioner nor the dissenters undertake—is best left to the City Council. The City Council can bring its substantial legislative expertise to bear on these questions if it chooses to do so (see Russell, — NY3d at &mdash, 2024 NY Slip Op 02226, *5 ["Whether to make the far-reaching change . . . (to interpretation of the NYCHRL) is a question for the City Council, not this Court"]).
For the above reasons, petitioner's claims of discrimination under the New York State Human Rights Law (Executive Law § 296 [5]) and the Federal Fair Housing Act and Civil Rights Act of 1964 also fail. To the extent the dissent argues that the similar text of the state law to the NYCHRL requires similar interpretation (see Rivera, J., dissenting op at 9-10), that contention is not developed before us. Petitioner's claim of sex discrimination under Civil Rights Law § 19-a is unpreserved.
 
We defer to the cooperative board's rejection of petitioner's application and find that even under the heightened reasonableness analysis it applied to her as a family member, consent was reasonably withheld based on her financial representations to the board (see Matter of Levandusky v One Fifth Ave. Apt. Corp., 75 NY2d 530, 538-539 [1990]); Matter of Kotler v 979 Corp., 191 AD3d 473, 474 [1st Dept 2021]).
Accordingly, the order of the Appellate Division should be affirmed, with costs.

WILSON, Chief Judge (dissenting):

I dissent and write separately because I believe we need not reexamine the definition of "marital status" to resolve this case. The Code's housing provisions have very different text from the Code's provisions concerning other forms of discrimination. The housing provisions prohibit discrimination against not only an individual, but also "a group of persons," like a couple [FN6]. Even adopting the narrowest view of "marital status," housing discrimination against a couple for being married, unmarried, separated or divorced is prohibited.
The proprietary lease at issue in this case requires tenants to obtain the approval of the co-operative's Board of Directors for any transfer except "an assignment, transfer or bequest to the Lessee's [*8]spouse." Because Mr. Burrows and Ms. McCabe never married or obtained a registered civil partnership, the Board refused to extend this provision to them. I would hold that Ms. McCabe and Mr. Burrows were discriminated against as a couple on the basis of their marital status as unmarried [FN7]. That is plain from the words of the statute. But even if it were necessary to examine the legislative history, it fully supports the proposition that the City Council intended to prohibit the differential treatment of married and unmarried couples.
I
Section 8-107 (5) (a) (1) of the NYCHRL makes it unlawful to discriminate in the provision of housing accommodations "[b]ecause of the actual or perceived . . . marital status . . . of any person or group of persons." Sections 8-107 (5) (a) (1) (a), (b) and (c) delineate the conduct that is prohibited under the Code. Each section refers explicitly to conduct against a person or persons, in the plural ("[a] To refuse to sell, rent, lease, approve the sale, rental or lease or otherwise deny to or withhold from any such person or group of persons such a housing accommodation or an interest therein; [b] To discriminate against any such person or persons in the terms, conditions or privileges of the sale, rental or lease of any such housing accommodation or an interest therein or in the furnishing of facilities or services in connection therewith; or [c] To represent to such person or persons that any housing accommodation or an interest therein is not available for inspection, sale, rental or lease when in fact it is available to such person"). The Code's employment and public accommodations provisions, in contrast, apply only to a "person," in the singular.[FN8]
We have long recognized that legislators do not "deliberately place a phrase in the statute which was intended to serve no purpose" and that "each word must be read and given a distinct and consistent meaning" (Matter of Rodriguez v Perales, 86 NY2d 361, 366 [1995], quoting Matter of Smathers, 309 NY 487, 495 [1956]). The text of section 8-107 (5) (a) (1) prohibits discrimination in housing against (1) a person, or (2) a group of persons. A couple of persons in a relationship are "persons" or "a group of persons." The plain language of the housing provisions prohibits discrimination against a couple.
Specifically, the Code prohibits discrimination against a couple on the basis of marital status. The majority defines marital status as "the legal condition of being single, married, legally separated, divorced, or widowed" (majority op at 8). Because resolving this case does not require us to define the scope of marital status, I neither adopt nor reject the majority's definition. I simply apply it to the people protected by the NYCHRL's housing provisions under the plain language of the statute. Under the majority's definition, a landlord (or cooperative corporation) could not reject a tenant (or buyer) on the ground that the tenant was married, or single, or divorced. I agree: doing so would constitute discrimination against that person on the basis of marital status. That definition can easily be applied to the "group of persons" called a couple as well as to individuals—it is commonplace to describe a couple as unmarried, married, separated or divorced.
The majority's interpretation of the NYCHRL gives no meaning to City Council's reference to a "group of persons" and repeated use of the plural "persons" in section 8-107 (5) (a) (1). Nor does it ascribe any meaning to the Council's choice to use the plural "persons" in the housing context and the singular "person" in the employment and public accommodations contexts.
The incompatibility of the majority's test with the text of the Code becomes apparent when we ask how the majority could ever find that a landlord discriminated against "persons" based on marital status [FN9]. Imagine a landlord who will happily rent to married couples or single individuals but refuses [*9]to rent to an unmarried couple because she does not believe in cohabitation outside marriage. The majority would presumably hold that the landlord is not discriminating based on marital status; she is simply discriminating on the basis of who the two individuals are (not) married to. Imagine that the same landlord refuses to rent to two single people who wish to live together, because she fears a relationship may develop between them. If the landlord would have rented to the pair were they married, is she only discriminating against them based on their relationship to each other? The majority thus renders the phrase "group of persons" meaningless in section 8-107 (5) (a) (1).
II
The majority relies on the inclusion of "partnership status" in the NYCHRL for the proposition that "the City Council did not understand the bar on 'marital status' discrimination to cover unmarried couples" because "[i]f it did . . . there would have been no need for the amendment" (majority op at 9). If that is true, we are faced with two options: (1) a construction of the statute that renders protections based on partnership status superfluous, or (2) a construction of the statute that renders the phrase "group of persons" meaningless. Thankfully, we have guidance from the City Council itself on how to resolve such an impasse. We must construe the Code "broadly in favor of discrimination plaintiffs, to the extent such a construction is reasonably possible" (Albunio v City of New York, 16 NY3d 472, 477-478 [2011]). By rendering "group of persons" meaningless, the majority narrows the Code's scope. Giving the phrase meaning broadens the Code in favor of discrimination plaintiffs like Ms. McCabe.
But the City Council's broad construction mandate need not come into play, because applying marital status protections to couples does not render partnership status superfluous. Supreme Court's decision in Levin cited an Appellate Division decision holding that a domestic partnership is not a "marital status" under state law (Levin v Yeshiva University, 180 Misc 829, 834-835 [Sup Ct 1999], citing Funderburke v Uniondale Union Free School Dist. No. 15, 251 AD2d 622, 623 [2d Dept 1998] ["We do not find that a domestic partnership is a 'marital status' within the meaning of Executive Law § 296"]). Funderburke suggested that discrimination based on partnership status alone (including discrimination against an individual for their status of being in a domestic partnership) would not be prohibited marital status discrimination [FN10]. And the majority's definition [*10]of what constitutes marital status—based on the plain meaning of that term—does not, of course, include the status of being in a domestic partnership.
To illustrate the separate value of protection based on partnership status, imagine three couples: Micah and Morgan are married, Devon and Dana are in a domestic partnership, and Lindsey and Leslie are unmarried life partners. A prohibition on marital status discrimination against couples would prevent a landlord from refusing to rent to Micah and Morgan because they are married, or to Lindsey and Leslie or Devon and Dana because they are not. But it might not prevent a landlord from discriminating against Devon and Dana for being in a domestic partnership. A landlord might, for example, rent to married or unmarried couples but refuse as a matter of policy to rent to couples in a domestic partnership in an attempt to evade the Code's protections against sexual orientation discrimination. Another landlord might refuse to rent to Lindsey and Leslie because despite having the option to become domestic partners, they have chosen not to. And Devon and Dana might experience partnership status discrimination as individuals. An employer who opposed the creation of domestic partnerships might, for example, fire Devon for entering into one. If being in a domestic partnership is not a marital status, that conduct would not be prohibited without the addition of "partnership status" to the Code.
III
Granting groups—not just individuals—protection against housing discrimination reflects the world we live in. Couples look for homes together, co-sign leases and mortgages together, move in together, and live together. Unmarried couples are choosing to do so more than ever. Cohabitation among unmarried couples has more than doubled since the mid-1990s. Today, approximately 7% of adults (or 17 million people) live with a partner to whom they are not married (United States Census Bureau, Unmarried Partners More Diverse Than 20 Years Ago [Sept. 23, 2019], https://www.census.gov/library/stories/2019/09/unmarried-partners-more-diverse-than-20-years-ago.html).
The rise in unmarried cohabitation reflects broader changes in our attitudes towards marriage. In 1960, 72% of U.S. adults were married. By 2016, that number had fallen to 50%. The marriage rate is lower for Americans with no college education: in 2015, 65% of Americans over 25 with bachelor's degrees were married and 50% of Americans over 25 with a high school education or less were married. And the marriage rate is lower for Black and Latinx Americans: 30% of Black adults, 46% of Latinx adults, and 54% of white adults are married (Pew Research Center, As U.S. Marriage Rate Hovers at 50%, Education Gap in Marital Status Widens [Sept. 14, 2017], https://www.pewresearch.org/short-reads/2017/09/14/as-u-s-marriage-rate-hovers-at-50-education-gap-in-marital-status-widens/). Discrimination against unmarried couples affects not only couples, but their children too: approximately 5 million children are being raised by unmarried cohabiting [*11]parents (id.).
Not everyone views these changes as positive: 30% of U.S. adults believe either that it is never acceptable to cohabitate outside marriage, or that it is acceptable only if the couple plans to marry (Pew Research Center, Key Findings on Marriage and Cohabitation in the U.S. [Nov. 6, 2019], https://www.pewresearch.org/short-reads/2019/11/06/key-findings-on-marriage-and-cohabitation-in-the-u-s/). Where these views collide with the lives of New Yorkers, City Council has chosen to say that persons—plural—should be able to access housing without regard for their marital status.
By ignoring the Council's words, the majority does great damage to marital status protections in the housing context, creating a rule that functionally protects only those who seek housing alone. Under the majority's rule, a landlord could not refuse to rent to a single person for being unmarried or a divorced person for being divorced (or a married person seeking housing alone for being married). But a landlord who does not believe in cohabitation outside marriage could refuse to rent to an unmarried couple because they are not married to each other. And a landlord who does not believe in marriage could refuse to rent to a married couple because they are. Here, the majority holds that a co-operative can withhold benefits from unmarried couples because they are unmarried, while giving those same benefits to married couples. The plain language of the NYCHRL is incompatible with that outcome.
RIVERA, J. (dissenting):
Petitioner Maryann McCabe and her intimate life partner David Burrows lived together in his cooperative apartment as spouses, where she cared for him until the day he died. Unsurprisingly, Burrows left petitioner the apartment in his will and named her the executor of his estate. In addition, Burrows' lease provides, in part, that, upon his death, the cooperative will automatically assign the lease and shares to his surviving spouse. Based on both this lease and testamentary disposition, petitioner requested the transfer of the apartment and shares to her name. Respondent refused on the grounds that petitioner and Burrows were neither married nor registered domestic partners. Petitioner sued, relying, in part, on the New York City and New York State Human Rights Laws (NYCHRL and NYSHRL, respectively), which prohibit discrimination in housing based on marital status.
Petitioner should prevail on her claim because she was denied a benefit that respondent concedes she would have received if she was married. Instead, the majority invokes the Court's prior narrow construction of "marital status" to justify respondent's blocking of the transfer as a denial based on her not being married to Burrows rather than her being unmarried generally (see Levin v Yeshiva Univ., 96 NY2d 484, 490 [2001]). Even assuming that construction made sense when it was first adopted, it is no longer a viable reading because the City and State Human Rights Laws have since been amended to require us to construe them "broadly in favor of discrimination plaintiffs, to the extent that such a construction is reasonably possible" (Albunio v City of New York, 16 NY3d 472, 477-478 [2011]), to maximally achieve their remedial antidiscrimination purposes (see Syeed v Bloomberg L.P., 41 NY3d 446, 451 [2024]; Executive Law § 300; Administrative Code of City of New York § 8-130 [a]).
Given these clear legislative directives, it is incumbent upon us to construe "marital status" to protect an individual against discrimination based on their lack of membership in a class of married or unmarried or an intimate life partnership regardless of the partnership's marital status. Indeed, a person's "marital status" is wholly dependent on the existence or nonexistence of an intimate relationship with another person—because one cannot be married to oneself, "marital status" is always a relational identity. The majority's reading defies the law's plain text and inescapable directive, thereby leaving persons like petitioner vulnerable to intolerable discrimination. I therefore dissent.
I.
Petitioner alleges that Burrows was her intimate life partner for years and that, when Burrows died, they lived as spouses in a cooperative apartment that Burrows owned and which was in his name. [*12]Like many life partners—married and unmarried—petitioner cared for Burrows in their home when he fell ill. Then, before Burrows passed away, their counsel wrote to the cooperative, stating that Burrows wanted "to add his longtime partner Maryann McCabe to the stock certificate and proprietary lease, as joint tenants with rights of survivorship." Counsel noted their long-term relationship—that the two had lived in the apartment "for the past 12 years" and "been partners for over 25 years." The request was still pending with respondent when Burrows died the following year.
In accordance with their wishes, petitioner requested transfer of the apartment to her name. Despite their public long-term relationship, years of living together as intimate partners in the apartment, Burrows' inter vivos request, and Burrows' testamentary transfer of the apartment to petitioner, respondent denied the transfer and demanded that petitioner leave. Petitioner renewed her transfer request, providing respondent with a copy of Burrows' will and invoking paragraph 16 (b) of Burrows' lease. That paragraph provides that, upon a lessee's death, "consent shall not be unreasonably withheld or delayed to an assignment of the lease and shares to a financially responsible member of the Lessee's family (other than the Lessee's spouse as to whom no consent is required)" (emphasis added). Respondent concedes that, by its plain terms, this provision requires automatic transfer to the decedent lessee's surviving spouse.
Respondent again refused transfer on the grounds that petitioner was not Burrows' spouse, but informed petitioner that she could—like any other prospective resident—apply to purchase the apartment, and petitioner did so under protest. Respondent then served petitioner with a notice to cure and notice of termination, without ruling on her purchase application. Afterwards, respondent rejected petitioner's purchase application on the ground that she failed to meet the financial requirements.
Petitioner, individually and as the Executor of Burrows' estate, filed an Article 78 petition seeking transfer of the shares and proprietary lease to her name. As exhibits, petitioner provided financial documents and public notices acknowledging her romantic long-term relationship with Burrows, including past family obituaries describing them as life partners. She alleges, as relevant here, that respondent violated the NYCHRL and NYSHRL—which prohibit discrimination based on marital status—because petitioner was Burrows' long time romantic partner and spousal equivalent. Supreme Court denied the petition and dismissed the proceeding and the Appellate Division affirmed (214 AD3d 564 [1st Dept 2023]). Both courts relied on this Court's prior decisions construing "marital status" discrimination as based on a complainant's status as married or unmarried versus a complainant's relationship to another person (see Levin, 96 NY2d at 490; Hudson View Props. v Weiss, 59 NY2d 733, 735 [1983]). We granted petitioner leave to appeal (40 NY3d 904 [2023]).[FN1]
Respondent concedes that it denied petitioner's request for an automatic transfer of the shares and lease under paragraph 16 (b) only because petitioner was not legally recognized as Burrows' spouse or domestic partner when Burrows died. That concession is fatal to respondent's defense under the [*13]Human Rights Laws because it admits plain discrimination against petitioner because she was not married to Burrows. But for this fact, respondent would have transferred the interest. Therefore, I would reverse the Appellate Division and grant the petition inasmuch as it seeks relief under the Human Rights Laws.
II.
The NYCHRL provides, in relevant part: "It shall be an unlawful discriminatory practice . . . [t]o refuse to sell, rent, lease, approve the sale, rental, or lease or otherwise deny to or withhold from any such person or group of persons such a housing accommodation or an interest therein; . . . [b]ecause of the actual or perceived . . . marital status . . . of any person or group of persons" (Administrative Code § 8-107 [5]). As part of the 2005 Restoration Act, which broadly reformed the NYCHRL, the City Council expanded the NYCHRL's construction provision to require that the law be "construed liberally for the accomplishment of the uniquely broad and remedial purposes thereof" "regardless of whether federal or New York state civil and human rights laws, including those laws with provisions worded comparably to provisions of this title, have been so construed" (Administrative Code § 8-130; Local Law No. 85 [2005] of City of NY § 7). Accordingly, construction of similarly-worded federal and state counterparts must be viewed "as a floor below which the City's Human Rights law cannot fall, rather than a ceiling above which the local law cannot rise" (id. § 1). The amendment was a response to what the Council viewed as judicial misapplication of the NYCHRL. As the City Council explained in the NYCHRL's text, at the time of the reform's passage, the courts had "construed [the NYCHRL] too narrowly to ensure protection of the civil rights of all persons covered by the law" (id. § 1). Hence the need to "restore" the NYCHRL.
Amidst this general concern about overly-narrow constructions defeating the NYCHRL's purpose, the Council had a specific concern that this Court's view of the "marital status" category gutted the law's capacity to protect against certain forms of discrimination—including discrimination against same sex partners who, at the time, could not marry in New York State.[FN2] However, intimate life partners, regardless of sexual orientation, could register as domestic partners and thus have their relationship recognized under City and State laws (see Administrative Code § 3-240; Executive Law § 354-b; Public Health Law § 2805-q [1]; Public Health Law § 4201 [1] [c] and [2] [a] [ii-a]). Therefore, in response to this concern, the Act added "partnership status" as one of the protected categories until the courts had an opportunity to properly apply the new liberal construction mandate. As explained in the Report by the Committee on General Welfare, "[p]ending judicial reconsideration of the proper scope of protection from discrimination based on marital status, this [partnership status] provision will ensure that 'domestic partners are protected 'from all forms of discrimination addressed by the human rights law' " (Report of the Comm on Gen Welfare, 2005 NY City Legis Ann at 536). The amendment thus served as a stopgap measure which placed married [*14]persons and persons in a legally recognized domestic partnership, as defined by the Act,[FN3] on equal footing for purposes of the NYCHRL. However, the Council expected that this Court would reconsider its view of "marital status," construe this term liberally to achieve the NYCHRL's remedial purposes, and apply that same liberal construction to "partnership status" in the future.
In 2016, the Council again amended the NYCHRL to further strengthen its protections, declaring that, "[e]xceptions to and exemptions from the provisions of [the NYCHRL] shall be construed narrowly in order to maximize deterrence of discriminatory conduct" (Local Law No. 35 [2016]). The Council also indicated its dissatisfaction with the courts' continued narrow approach to the NYCHRL (id., Rep of Comm on Civil Rights, Governmental Affairs Division at 8, Local Law Bill Jacket, Local Law No. 35 [2016]). The Council identified this Court's decision in Albunio (16 NY3d 472) and the First Department's Williams v New York City Housing Auth. (61 AD3d 62 [1st Dept 2009]) case as examples of decisions that "correctly understood and analyzed the liberal construction requirement" and "developed legal doctrines accordingly that reflect the broad and remedial purposes of" the NYCHRL (Administrative Code § 8-130). Both decisions reasoned that the Restoration Act required a broad construction of the NYCHRL to effectuate the Council's goal "to eliminate and prevent discrimination from playing any role in actions relating to employment, public accommodations and housing and other real estate" (Administrative Code § 8-101).
Like the NYCHRL, the NYSHRL prohibits discrimination based on marital status, declaring it unlawful to, "refuse to sell, rent or lease or otherwise to deny to or withhold from any person or group of persons such housing accommodations because of the . . . marital status . . . of such person or persons" (Executive Law § 296 [5]). The NYSHRL has a remedial purpose similar to that of the NYCHRL—to "eliminate and prevent discrimination in employment, in places of public accommodation, resort or amusement, in educational institutions, in public services, in housing accommodations, in commercial space and in credit transactions" (id. § 290 [3]).
In 2019, the state legislature amended the NYSHRL to expand its protections and adopted an enhanced liberal construction requirement almost identical to the language in the NYCHRL (S. 6577, 242d Leg. § 16 [NY 2019]; Executive Law § 300). The NYSHRL now provides, with added [*15]language in bold:
"The provisions of this article shall be construed liberally for the accomplishment of the remedial purposes thereof, regardless of whether federal civil rights laws, including those laws with provisions worded comparably to the provisions of this article, have been so construed. Exceptions to and exemptions from the provisions of this article shall be construed narrowly in order to maximize deterrence of discriminatory conduct" (Executive Law § 300 [emphasis added]).
The State's choice of almost verbatim language found in the NYCHRL—which our courts had applied broadly for over a decade prior to the 2019 state amendment—confirms the State legislature's intent and understanding that these comparable provisions should also be broadly construed to achieve the same remedial antidiscrimination purposes. Before the 2019 amendments, the NYSHRL had generally been construed more narrowly than the NYCHRL because of the express mandate that the NYCHRL, be construed to apply more broadly than similarly-worded provisions of state and federal laws. Following the 2019 amendment, courts have applied the same analytical framework to NYSHRL and NYCHRL discrimination claims, in recognition that, given the now applicable parallel language, the statutes must be interpreted in kind (see Cobb v Ellab Inc., 2024 WL 1963430, at *5 [ND NY May 2, 2024, No. 122CV1002MADCFH]; Cannizzaro v City of New York, 82 Misc 3d 563, 577, 2023 NY Slip Op 23393 [NY Sup Ct 2023]; Charles v City of New York, 2023 WL 2752123, at *6 [SD NY Mar. 31, 2023, No. 21 CIV. 5567 (JPC)]). We too have come to the same recognition that construction of the NYSHRL and NYCHRL follow the same interpretative path (Syeed, 41 NY3d at 451-453). Therefore, there is but one liberal construction of "marital status" that applies to petitioner's claims under each of the Human Rights Laws.
III.
Under this rule of construction, "[c]ourts must construe the Human Rights Laws 'broadly in favor of discrimination plaintiffs, to the extent that such a construction is reasonably possible' " (Syeed at 451, quoting Albunio, 16 NY3d 472, 477-478, citing Makinen v City of New York, 30 NY3d 81, 88 [2017]). Applying this rule, "marital status" under the Human Rights Laws covers both (1) a person's membership in a class of married or unmarried persons, and (2) a person's marital status in relation to another person. This construction is both logical and eminently reasonable because it guarantees equal treatment among individuals different from one another based solely on the proscribed classification. The proscription common to both Human Rights Laws eliminates marriage as a basis for differential treatment between persons who are similarly situated. It further recognizes the obvious: that married status is based on the existence or nonexistence of an intimate life partner relationship with someone else. Thus, we must construe "marital status" liberally to protect a complainant based both on a general unspecified association to a protected group (e.g. petitioner is unmarried) as well as on the specific individual relationship that defines the complainant as a member of the protected group (e.g. petitioner is unmarried to Burrows).
The Appellate Division correctly adopted this construction in Morse v Fidessa Corp. when it [*16]observed that "[e]ncompassing the marital status of two people vis-a-vis one another within the meaning of the term 'marital status' is, at minimum, a reasonable construction" (165 AD3d 61, 68 [1st Dept 2018]). There, the court concluded that " '[m]arital status' may refer to whether an individual is married or not married. It may also refer to whether two individuals are married to each other or not married to each other" (id. at 68). As Morse further noted, "a narrow interpretation of 'marital status' would allow a wide range of discriminatory conduct—including conduct arising out of assumptions based on stereotypes—to continue unabated" (id. at 68-69). Construing "marital status" to include discrimination based on an intimate life partner relationship to another person is "the best way to achieve broad coverage of the city law in accordance with the stated goal of the Council to 'meld the broadest vision of social justice with the strongest law enforcement deterrent' " (id. at 72, citing Comm Rep at 11 [internal quotation marks omitted]; Williams, 61 AD3d at 68).
As applied here, the analysis is straightforward. Respondent concedes that it denied petitioner's request for an automatic transfer of Burrows' lease and shares, as required by paragraph 16 (b) of the lease, solely because at the time of Burrows' death, he and petitioner were not married or registered domestic partners. Thus, respondent extends a benefit to all cohabitating partners except those who are unmarried and unregistered, regardless of their actual loving and committed lifelong intimate relationship. That denial is prototypical discrimination—denial of a benefit based on lack of membership in a preferred group, here the married or domestic partner survivor of the tenant.
IV.
The majority adopts respondent's view that we must adhere to the construction of "marital status" under the Human Rights Laws the Court first adopted under the old statutory frameworks in the 1980s. In doing so, the Court ignores that our task now, over four decades later, is to construe the current versions of the Human Rights Laws that facially reject both the definition of "marital status" and, as a consequence, the antiquated analytical approach the majority retains today.
The Court first narrowly construed "marital status" under the NYSHRL in a challenge to an employer's anti-nepotism rule which "forb[a]d[e] an employee from working under the supervision of a [ ] spouse" (Manhattan Pizza Hut, Inc. v New York State Human Rights Appeal Bd., 51 NY2d 506, 509 [1980]). The employee in Manhattan Pizza Hut was fired because she was married to her supervisor. To discern the meaning of "marital status" the Court relied on "the obvious and fundamental rule of construction that words of common usage are to be given their ordinary meaning"—a general rule applied by courts to ascertain legislative intent (id. at 511, citing McKinney's Cons Laws of NY, Book 1, Statutes § 94).
"So tested, the plain and ordinary meaning of 'marital status' is the social condition enjoyed by an individual by reason of his or her having participated or failed to participate in a marriage. Illuminated another way, when one is queried about one's 'marital status', the usual and complete answer would be expected to be a choice among 'married', 'single', etc., but would not be expected to include an identification of one's present or former spouse and certainly not the spouse's occupation" (id. at 511-512).
Thus, the genesis of the Manhattan Pizza Hut Court's view of marital status is a general rule now displaced by the respective amendments to the Human Rights Laws which substitute a rule of construction that the laws be "broadly in favor of discrimination plaintiffs, to the extent that such a construction is reasonably possible" (Albunio, 16 NY3d at 477-478).[FN4]
The Manhattan Pizza Hut construction has been the source of disagreement since its adoption. Chief Judge Cooke in dissent observed that marital status under the NYSHRL encompassed the employer's termination of the employee because the sole ground for termination was that she was married to another employee, and the majority's reasoning ignored this plain construction of the statute (Manhattan Pizza Hut, 51 NY2d at 515 [Cooke, Ch. J., dissenting]).
Manhattan Pizza Hut must be understood in context as reflecting the Court's primary concern that a broader construction of marital status would invalidate anti-nepotism rules (51 NY2d at 511-513). There, the Court explained that anti-nepotism rules serve a valuable purpose to "avoid favoritism, whether conscious or unconscious" when "two close relatives work together" (51 NY2d at 513). True enough, but as Chief Judge Cooke explained, the employer's business considerations could easily be accommodated in a non-discriminatory manner because "[a]n employer should be free to prevent personal relationships between supervisors and other employees from disrupting the work environment through rules focused on such a problem, not by unwarranted interference with a protected status" (51 NY2d at 516 [Cooke, Ch. J., dissenting]). Thus, the NYSHRL marital status prescription and anti-nepotism rules need not be in tension.
The Court next applied the construction adopted in Manhattan Pizza Hut in Hudson View, a case involving a restrictive covenant that limited occupancy under the lease to a tenant and their immediate family (see 59 NY2d 733 [1983]). The Hudson View Court concluded enforcement of this covenant was not marital status discrimination, reasoning that "the issue arises not because the tenant is unmarried but because the lease restricts occupancy of her apartment, as are all apartments in the building, to the tenant and the tenant's immediate family" (id. at 735). Like in Manhattan Pizza Hut, the Hudson View Court relied on a now-legislatively-discarded general rule of construction (Syeed, 41 NY3d at 451; Albunio, 16 NY3d at 477-478). And again, the Court provided no reason in its short memorandum opinion for why it concluded that the complainant's actual relationship—she was unmarried, rather than married, to the proposed occupant—was irrelevant to its analysis other than because it said so.
Then in 2001, the Court in Levin rejected claims brought by a student and her same-sex partner that a university violated both Human Rights Laws by denying them university-owned housing on the basis that they were not married, reasoning that the policy limitation was not based on marital status (see generally 96 NY2d at 484).[FN5] The Court explained that, under its precedent, [*17]"for purposes of applying the statutory proscription, a distinction must be made between the complainant's marital status as such, and the existence of the complainant's disqualifying relationship—or absence thereof—with another person" (id. at 490). The Court concluded that the university's policy was "restricted to those in legally recognized, family relationships with a student, not the student's marital status," and was therefore indistinguishable from the policy in Hudson View, which limited occupancy to the tenant's immediate family (id. at 490-491). As such, the university policy—like the Hudson View policy—did not discriminate on its face based on marital status in violation of the Human Rights Laws.[FN6]
Dissenting from the portion of Levin adhering to the Manhattan Pizza Hut construction, Chief Judge Kaye concluded that the plaintiffs properly pleaded claims based on marital status discrimination, because the plaintiffs were "denied partner housing merely because they were unmarried" (96 NY2d at 502 [Kaye, Ch. J., dissenting in part]). As she explained, the Human Rights Laws "bar[ ] decisions from being made on the basis of whether a person is 'single, married, divorced, separated or the like' " which, she concluded, "is exactly what happened" to the plaintiffs (id., citing Manhattan Pizza Hut, 51 NY2d at 512). Chief Judge Kaye also distinguished Manhattan Pizza Hut because that case turned on the sound reasons for anti-nepotism rules, which were not at issue in Levin (id. at 502). Hudson View also was measurably different because the tenant there never asserted that her romantic partner was her immediate family member (id. at 501). In contrast, "the gravamen of [the Levin] plaintiffs' complaint is that they share the same level of commitment with their partners as married persons share with their spouses—that their life partners are members of their immediate families" (id.).
As both Chief Judges Cooke in Manhattan Pizza Hut and Chief Judge Kaye in Levin observed, the narrow construction of the "marital status" discrimination proscription is contrary to the commonsense understanding that one can only be married or unmarried by reference to another person. That understanding tolerates a class-wide distinction plainly at odds with the Human Rights Laws' antidiscrimination goals.
V.
In an attempt to justify settling on the same narrow, now inapt construction of marital status that this Court adopted over four decades ago, the majority advances a variety of arguments. Some are directly at odds with the Supreme Court's statutory construction approach to Title VII—which is the floor below which the protections of our human rights laws cannot fall—in Bostock v Clayton County, Georgia (590 US 644 [2020]). All of the arguments are unpersuasive.
To the extent the majority suggests that the construction mandates of the Human Rights Laws do not apply to the provisions that list the protected classifications (Administrative Code § 8-107 [5]; Executive Law § 296 [5])—that somehow the construction provision applies piecemeal—that approach finds no textual support in the respective statutes (majority op. at 14). Neither the NYCHRL nor the NYSHRL expressly limit their broad construction mandate to apply to everything but the classifications. Certainly, no such implication can be drawn from a mandate that we construe the laws liberally to effectuate their antidiscrimination remedial purposes, since a narrow interpretation would permit rather than discourage or eliminate discriminatory actions.[FN7]
Nevertheless, the majority contends that because the City Council has defined protected categories with precision, and acted to expand protections when it deemed it appropriate the failure to expressly add "unmarried couples" signals that the Council has excluded them from the NYCHRL protections (majority op at 11). That reasoning ignores the Council's command that we construe every term in the NYCHRL broadly to effectuate the statute's remedial purposes and the Council's overall goals. Any doubts on this point are laid to rest by the Committee on Civil Rights 2016 report which explains that the purpose of referring to cases in the 2016 law was to "reaffirm that courts must apply the liberal construction provisions in every case and with respect to every issue" (Comm Rep of the Governmental Affairs Division and Comm on Civil Rights, at 8-9 [Mar. 8, 2016]).
The majority reasons that "other provisions of the NYCHRL reinforce[] [its] understanding" that " 'marital status' " refers to whether a person is participating in a marriage, not the nature of one's relationship with another specific person" (majority op at 9). In addition to defying logic, by treating "married" as a solitary identity, the majority's attempt to justify its adherence to a narrow construction in contravention of the textual mandate fails on its own terms.
First, the majority claims that a broad construction would render superfluous the "partnership status" classification (see majority op at 9-10). That misunderstands the amendment's purpose, which was to equate the registered domestic partnerships with marriage; both classifications legally recognize an intimate relationship. The express addition of "partnership status," however, has no bearing on the scope of the discrimination proscription. Partners receive no greater or less protection than persons who are married. Under the 1980s construction retained by the majority, an intimate life [*18]partner who is neither married nor a registered partner can be denied housing accommodations based on their relationship to their chosen life partner. Petitioner's case illustrates this point; respondent denied petitioner the automatic transfer of the apartment lease and shares because she was not Burrows' surviving spouse or domestic partner. Indeed, as the majority acknowledges (see majority op at 10), even under that construction, "partnership status" is superfluous because a person who is a partner, as defined by the NYCHRL, is legally not a married person and thus would be protected to the extent the narrow construction protects any person because they are not married. The majority points to this corollary as evidence that the Council understood that domestic partners are not covered by the "marital status" classification. Perhaps the Council did have this understanding in mind, but not for the reason the majority presumes. The Council simply intended domestic partners to be no better or no worse off than married persons. That does not tell us that we must read the status of both classifications narrowly. The NYCHRL structure signals the contrary. As to how we actually construe the classifications we have a clear (not an imagined) mandate: read the entirety of the NYCHRL broadly in favor of discrimination plaintiffs, because "[c]ourts must construe the Human Rights Laws 'broadly in favor of discrimination plaintiffs, to the extent that such a construction is reasonably possible' " (Syeed, 41 NY3d at 451, quoting Albunio, 16 NY3d 472, 477-478). I cannot see how the majority's construction favors plaintiffs when the construction allows discrimination against an intimate partner even though their relationship has all the indicia of a marriage or domestic partnership and lacks only the legal label. The majority's explanation of how the addition of "partnership status" somehow prohibits a broad reading of marital status also provides no satisfactory explanation for why the Report by the Committee on General Welfare, explicitly noted that the addition was a stopgap "[p]ending judicial reconsideration of the proper scope of protection from discrimination based on marital status" (Report of the Comm on Gen Welfare, 2005 NY City Legis Ann at 536; see majority op at 15 n 2). It strains credulity to read this statement of legislative intent to mean that the Council meant for us to "revisit" our definition of marital status and retain our previous interpretation, rather than engaging in a liberal construction analysis which, as I explain, leads to a different result.
The majority offers another "structural" argument: that the 2016 amendment's addition of "caregiver status" indicates that the Council does not intend for us to broadly construe those classifications it does include (see majority op at 11). That argument is flawed for similar reasons. The caregiver status classification applies to the NYCHRL employment discrimination proscriptions and protects workers against adverse employment actions based on the prospective or existing employee's caregiving responsibilities. It does not limit our construction of marital status at all. And, of course, this Court has already made clear that: (1) a complainant may have multiple bases for challenging an alleged discriminatory act; and (2) a failure on one does not automatically foreclose success on another (see Levin, 96 NY2d at 490).
The United States Supreme Court squarely rejected similar reasoning in Bostock (590 US at 644). Bostock involved Title VII of the Civil Rights Act—a law that notably does not have the same stringent construction mandates as the statutes at issue here—specifically, whether its prohibition of discrimination " 'because of . . . sex' " (42 USC § 2000e-2 [a] [1]) extended to discrimination based on "sexual orientation" (Bostock, 590 US at 656). The Court held that it does over the dissenters' protests that the text did not include "sexual orientation" and that the legislature has rejected attempts to amend Title VII to include that classification (compare id., with id. at 683 [*19][Alito, J., dissenting], and id. at 780-783 [Kavanaugh, J., dissenting]).
The Bostock majority's analysis is instructive and forecloses much of the current majority's contrived "structural" analysis. As to the majority's claim that "marital status" was traditionally not understood to include marital relationships (see majority op 8-9), Bostock cautions:
"Those who adopted the Civil Rights Act might not have anticipated their work would lead to this particular result. Likely, they weren't thinking about many of the Act's consequences that have become apparent over the years, including its prohibition against discrimination on the basis of motherhood or its ban on the sexual harassment of male employees. But the limits of the drafters' imagination supply no reason to ignore the law's demands. When the express terms of a statute give us one answer and extratextual considerations suggest another, it's no contest. Only the written word is the law, and all persons are entitled to its benefit" (id. at 653).
The current majority's reliance on the Council's choice not to explicitly amend the definition of marital status as a basis for ignoring the Council's broad-construction command (see majority op at 16-18) endorses the very same flawed reasoning that Bostock rightly rejected:
"There's no authoritative evidence explaining why later Congresses adopted other laws referencing sexual orientation but didn't amend this one. Maybe some in the later legislatures understood the impact Title VII's broad language already promised for cases like ours and didn't think a revision needed. Maybe others knew about its impact but hoped no one else would notice. Maybe still others, occupied by other concerns, didn't consider the issue at all. All we can know for certain is that speculation about why a later Congress declined to adopt new legislation offers a 'particularly dangerous' basis on which to rest an interpretation of an existing law a different and earlier Congress did adopt" (id. at 670, quoting Pension Benefit Guaranty Corp. v LTV Corp., 496 US 633, 650 [1990]; see also Flanagan v Mount Eden Gen. Hosp., 24 NY2d 427, 433 [1969] ["The practicalities of the legislative process furnish many reasons for the lack of success of a measure other than legislative dislike for the principle involved in the legislation. Legislative inaction is a weak reed upon which to lean in determining legislative intent]). Nor can Bostock's rationale be distinguished on the grounds that legislative inaction post-dated the rulings from this Court that adopted a narrow interpretation of marital status. Before Bostock, Circuit precedent stretching as far back as the 1970s interpreted "sex discrimination" in Title VII to exclude sexual orientation discrimination—and this narrow interpretation was, in part, what variations of the Equality Act sought to rectify from that decade onwards (see e.g. Blum v Gulf Oil Corp., 597 F2d 936, 938 [5th Cir 1979]; Evans v Georgia Regional Hosp., 850 F3d 1248, 1255 [11th Cir 2017]; HR 14752, 93rd Cong, 2d Sess., §§ 6, 11 [1974]; HR 2015, 110th Cong, 1st Sess., §§ 3, 4 [2007]).
[*20]Bostock also rejected the majority's bases for its adherence to the Court's narrow reading—that it is "best left to the City Council" to "weigh[] the consequences" of such a broad interpretation, and "had the Council intended to require that marital status be extended to cover discrimination based on one's relationship to another, we assume it would have amended the statute to say exactly that" (majority op at 17-19):
"[There is no] such thing as a 'canon of donut holes,' in which Congress's failure to speak directly to a specific case that falls within a more general statutory rule creates a tacit exception. Instead, when Congress chooses not to include any exceptions to a broad rule, courts apply the broad rule. And that is exactly how this Court has always approached Title VII. 'Sexual harassment' is conceptually distinct from sex discrimination, but it can fall within Title VII's sweep. Same with 'motherhood discrimination.' Would the employers have us reverse those cases on the theory that Congress could have spoken to those problems more specifically? Of course not. As enacted, Title VII prohibits all forms of discrimination because of sex, however they may manifest themselves or whatever other labels might attach to them" (id. at 669-670).
The majority in this case further cites Manhattan Pizza Hut for the proposition that the definition of "marital status" should stem from thinking of how one would answer when queried about one's marital status, and how this "turns on whether an individual has participated or failed to participate in a marriage" which is "distinct from the identity or situation of the individual's spouse" (majority op at 8, citing 51 NY2d at 511). This approach, according to Bostock, "rests on a mistaken understanding of what kind of cause the law is looking for" (590 US at 666). The better test is to apply the but-for test required by the "because" language of civil rights law, which, "directs us to change one thing at a time and see if the outcome changes. If it does, we have found a but-for cause" (id.).
Here, of course, and contrary to the majority's exhortations to the contrary (see majority op at 16 n 5), if "one thing" about petitioner is changed—from being unmarried to married—the outcome changes, making the Supreme Court's but-for test glaringly applicable. Petitioner would not be evicted from her apartment in which she built a life with her now-deceased partner, but would get to stay in their home—and grieve—in peace. Of course, the Court's previous construction of "marital status" predates Bostock. But we now have both the benefit of the Supreme Court's analysis and the NYCHRL and NYSHRL's mandate that we may not construe those statutes in a manner that provides less protection than federal law. The majority's adherence to the old construction ignores decades of legal developments discrediting it.
As a final desperate attempt to justify its restrictive construction, the majority leans on the City Council to undo the mistake the majority makes today. If the Court has gotten things wrong, the majority assures, the Council can always correct it (see majority op at 18-19).[FN8] That states the [*21]obvious—the legislature always has authority to clarify its enactments when the courts misapply them—but it offers no help for the majority here, where the Council heavily criticized the very same construction the Court retains today when the Council enacted the Restoration Act in the wake of Levin.
"Indeed, Levin was cited in connection with the passage of the Restoration Act as illustrative of the cases that had 'either failed to interpret the City Human Rights Law to fulfill its uniquely broad purposes, ignore the text of specific provision of the law, or both.' With the passage of the Restoration Act, these cases and others like them will no longer hinder the vindication of our civil rights." (Morse, 165 AD3d at 67-68 [some internal quotation marks omitted], citing Williams, 61 AD3d at 67, quoting from transcript of Council debate).
If inaction tells us anything, it tells us that the majority is wrong to adhere to the pre-Restoration Act construction of "marital status." The fact is that the Council has had the opportunity to consider the impact of the broad construction I would adopt and to take corrective action ever since the Appellate Division decided Morse. It has declined to do so. And as this Court knows all too well, the Council has readily criticized the courts for failing to properly construe the NYCHRL (see Local Law No. 85 [2005] of City of NY § 1; Local Law No. 35 [2016], 2016 NYC Leg. Ann. 177, LMA at 18, codified as Administrative Code § 8—130[c]). Surely, if this construction was contrary to the Council's intent, the Council would have legislatively overruled it by now. The majority should not ignore that the Council has approved of the broad construction in the only way it can, by leaving it in place.
Significantly, construing marital status broadly for purposes of the Human Rights Laws to encompass intimate life partners who are neither married nor a domestic partnership is workable in practice. Parties and courts can rely on the factors first set forth by this Court in Braschi v Stahl Assocs. Co. to evaluate whether such relationships are similarly-situated, including, "the exclusivity and longevity of the relationship, the level of emotional and financial commitment, the manner in which the parties have conducted their everyday lives and held themselves out to society, and the reliance placed upon one another for daily family services" (74 NY2d 201, 212-213 [1989]).[FN9] Our courts have been making these assessments in the housing context since the 1980s, so it is familiar terrain. Our courts have also made these determinations of what constitutes a "family" in cases involving zoning (Baer v Town of Brookhaven, 73 NY2d 942, 943 [1989] [five unrelated elderly [*22]women who lived together in a home were a family]), domestic relations (Matter of Brooke S.B. v Elizabeth A.C.C., 28 NY3d 1, 26 [2016] [overruling a narrow definition of "parent" that excluded non-biological and non-adoptive caregivers]), and in domestic violence cases which often require evaluation of whether there was an "intimate relationship" (Matter of Mark W. v Damion W., 25 Misc 3d 1148, 1150 [Fam Ct 2009]).
In sum, the Human Rights Laws mandate that we liberally construe those laws to achieve their remedial purposes. To that end we must construe the NYCHRL "broadly in favor of discrimination plaintiffs, to the extent that such a construction is reasonably possible" (Albunio, 16 NY3d at 477-478). The majority has failed to convincingly explain why the construction I would adopt, which aligns with the dissents in Manhattan Pizza Hut and Levin and which the Appellate Division endorsed years ago is not reasonable.
VI.
Societal attitudes have evolved during the decades since this Court first decided that the NYSHRL's and NYCHRL's bans on discrimination based on "marital status" do not apply to discrimination based on the complainant's relationship to someone else. The number of unmarried partners has increased (Courtney G. Joslin, Discrimination in and Out of Marriage, 98 BU L Rev 1, 3-4 [2018] ["In 1960, there were fewer than one million unmarried cohabitants. Today, there are over eighteen million"]). "[T]he percentage of children living with unmarried, cohabitating parents more than doubled between 1997, the first year that census data on cohabitation was available, and 2017" (Greene v Esplanade Venture Partnership, 36 NY3d 513, 527 [2021] [Rivera, J., concurring], citing Gretchen Livingston, Pew Research Ctr., About one-third of U.S. children are living with an unmarried parent [Apr. 27, 2018], https://www.pewresearch.org/fact-tank/2018/04/27/about-one-third-of-u-s-children-are-living-with-an-unmarried-parent/). The majority of Americans support allowing unmarried couples to have the same legal rights as married couples (Nikki Graff, Key findings on marriage and cohabitation in the U.S. [Nov. 6, 2019], Pew Research Ctr., https://www.pewresearch.org/short-reads/2019/11/06/key-findings-on-marriage-and-cohabitation-in-the-u-s/). The reality is that people organize their personal lives in a variety of ways; they choose to marry or not marry or register as domestic partners based on personal circumstances and preferences (Greene, 36 NY3d at 527 [Rivera, J., concurring] ["(F)amilies are formed not solely by matrimony and blood but also with bonds of friendship and love"]). Democratically-enacted New York law now honors and protects that choice in specified areas of public and private life. The majority's decision to adhere to the narrow views of the past ignores both the law and New York's tradition of strong human rights protections against bias and animus. In the light of the present, the most reasonable construction of "marital status" is straightforward: discriminatory conduct against consenting adults based solely on the fact that they are unmarried intimate life partners is prohibited by the Human Rights Laws.
I dissent.
Order affirmed, with costs. Opinion by Judge Halligan. Judges Garcia, Singas, Cannataro and Troutman concur. Chief Judge Wilson dissents in an opinion. Judge Rivera dissents in a separate opinion.
Decided December 17, 2024 

Footnotes

Footnote 1: To the extent Judge Rivera suggests a new interpretation of "partnership status" (see Rivera, J., dissenting op at 7), that issue is not before us.

Footnote 2: The Chief Judge's insistence that he takes no view on the meaning of "marital status" is puzzling (see Wilson, Ch. J., dissenting op at 4), since that is what is at issue in this appeal.

Footnote 3: The Committee Report on the 2005 amendment stated that the addition of "partnership status" protection was temporary "[p]ending judicial reconsideration of the proper scope of protection from discrimination based on marital status" (Report of the Comm on Gen Welfare, 2005 NY City Legis Ann at 536). This instruction likely also references the mandate to consider the scope of the NYCHRL independent of comparably worded state and federal provisions; whatever its meaning, it does not expressly direct the courts to overrule Levin's interpretation of the NYCHRL.

Footnote 4: Levin allowed a disparate impact claim based on sexual orientation discrimination to proceed (96 NY2d at 496). After Levin was decided, New York made same sex marriage lawful by statute in 2011 (L 2011, ch 95), and the U.S. Supreme Court held that the Fourteenth Amendment requires a State to license a marriage between two people of the same sex (Obergefell v Hodges, 576 US 644, 666 [2015]). Thus, the landscape has changed significantly since the specific criticisms lodged against Levin.

Footnote 5: Thus, contrary to the dissent's suggestion, even if we " 'change one thing' " (Rivera, J., dissenting op at 23, quoting Bostock v Clayton County, 590 US 644, 666 [2020]) about petitioner—from unmarried to married—the outcome would not change: respondent would still have denied petitioner's application for automatic transfer unless she were married to Burrows, specifically.

Footnote 6: Throughout this opinion, I use "couple" as a shorthand. In doing so, I do not intend to preclude the application of the NYCHRL's housing provisions to larger groups of persons.

Footnote 7: The majority writes that its holding does not address "whether the 2005 and 2016 enactments would yield a different result for a plaintiff similarly situated to the petitioner[s] in Levin," who were "denied partner housing . . . merely because they were unmarried" (majority op at 16, quoting 96 NY2d, 484, 502 [2001] [Kaye, Ch. J., concurring in part]). Although Ms. McCabe brought this claim in her individual capacity and as the executrix of Mr. Burrows's estate, her arguments to this court relied exclusively on her status as an individual, not as executrix. She therefore did not argue that the Board withheld an interest in the apartment (the ability to transfer it to a life partner without Board approval) from Mr. Burrows because he was unmarried (see Administrative Code of the City of New York § 8-107 (5) (a) (1) [prohibiting any "person having the right to . . . approve the sale . . . of a housing accommodation . . . or an interest therein, . . . (b)ecause of the . . . marital status . . . of any person or group of persons . . . (t)o . . . withhold from any such person or group of persons . . . a housing accommodation or an interest therein"]). That argument mirrors the one advanced by Chief Judge Kaye in Levin.

Footnote 8: For example, section 8-107 (1) (a) establishes that "[i]t shall be an unlawful discriminatory practice . . . (a) For an employer or an employee or agent thereof, because of the actual or perceived . . . marital status . . . of any person: . . . (2) To refuse to hire or employ or to bar or to discharge from employment such person; or (3) To discriminate against such person in compensation or in terms, conditions or privileges of employment" (emphasis added). Section 8-107 [4] [a] establishes that "[i]t shall be an unlawful discriminatory practice for any person who is the owner . . . of any place or provider of public accommodation: 1. Because of any person's actual or perceived . . . marital status, . . . directly or indirectly: (a) To refuse, withhold from or deny to such person the full and equal enjoyment, on equal terms and conditions, of any of the accommodations, advantages, services, facilities or privileges of the place or provider of public accommodation; or (b) To represent to any person that any accommodation, advantage, facility or privilege of any such place or provider of public accommodation is not available when in fact it is available" (emphasis added).

Footnote 9: The majority notes that the phrase "group of persons" "actually modifies all of the categories protected by the NYCHRL" (majority op at 13). I agree. Under the NYCHRL, it would be unlawful to discriminate against a group of persons, including a couple, on any prohibited ground. This opinion addresses what that means where, as here, a petitioner alleges discrimination on the basis of marital status. I have therefore focused my analysis on what constitutes marital status discrimination against a group. What it would mean to discriminate against a group on the basis of their race, creed, color, national origin, gender, age, disability, sexual orientation, uniformed service, height, weight, partnership status, or immigration and citizenship status is not at issue in this case. Likewise, the fact that the NYCHRL initially included the "group of persons" language before it prohibited discrimination on the basis of marital status does not change the meaning of the current statute: the law originally protected groups of persons from discrimination on certain bases, not including marital status, and marital status became a protected classification 8 years later.

Footnote 10: The majority characterizes my citation of Funderburke, which it correctly notes concerned employment discrimination, as inconsistent with the distinction I draw between housing and employment discrimination (majority op at 12). That characterization misses the point entirely. "Partnership status," like "marital status," means the same thing wherever it is used in the NYCHRL. The Appellate Division's decision in Funderburke helps us understand whether "marital status" encompasses the status of being in a domestic partnership. The distinction between the Code's employment and housing provisions is entirely separate. One set of provisions applies only to a "person," while the other applies to a "person or group of persons." I am not, as the majority suggests, giving the words "marital status" a different meaning in the housing and employment provisions. I am simply applying the majority's own definition of "marital status" to the "groups of" people the City Council has chosen to protect.

Footnote 1: Respondent asserts that it commenced a holdover proceeding against petitioner which is stayed pending resolution of this appeal.

Footnote 2: It was not until 2011 that New York enacted the Marriage Equality Act, legally recognizing marriage between same sex persons (L 2011, ch 95 [eff. July 24, 2011]).

Footnote 3: Partnership status is defined in the NYCHRL as, "the status of being in a domestic partnership, as defined by subdivision a of section 3-240" (Administrative Code § 8-102). Section 3-240 defines "domestic partners" as:
"persons who have a registered domestic partnership, which shall include any partnership registered pursuant to this chapter, any partnership registered in accordance with executive order number 123, dated August 7, 1989, and any partnership registered in accordance with executive order number 48, dated January 7, 1993, and persons who are members of a marriage that is not recognized by the state of New York, domestic partnership, or civil union, lawfully entered into in another jurisdiction" (Administrative Code § 3-240).

Footnote 4: This view was hardly compelling in the first place. Notably, the Manhattan Pizza Hut Court did not explain why marital status should be decoupled from the relationship that brings the complainant within the disparaged group.

Footnote 5: The policy pre-dates the 2011 Marriage Equality Act and so the university policy on its face denied its housing to all gay and lesbian intimate life partners (see supra n 2).

Footnote 6: Notably, and to its credit, the Levin Court concluded that the plaintiffs were not foreclosed from alleging another statutory ground and held that the plaintiffs sufficiently pleaded a claim that the university policy had a disparate impact based on sexual orientation, a protected classification under the NYCHR (id. at 496). However, the City Council found reliance on the sexual orientation classification inadequate to address discrimination against same sex couples and, as I have discussed, added the "partnership status" classification as a temporary ameliorative measure pending judicial reconsideration of the NYCHRL under the expanded liberal construction mandate (see supra at 6-7).

Footnote 7: The majority's suggestion is odd indeed since federal cases are the floor above which we must read the Human Rights Laws and the United States Supreme Court has recently interpreted Title VII's ban on sex-based discrimination broadly despite the lack of any Congressional directive and some legislative history suggesting that its broad interpretation was disfavored (compare Bostock v Clayton County, Georgia, 590 US 644 [2020], with Report of Comm on Gen Welfare [2005]; Committee Report of the Governmental Affairs Division, Committee on Civil Rights at 8 [Mar. 8, 2016]).

Footnote 8: Since the majority concludes that the NYSHRL claims fall under the narrow construction, presumably the majority believes the state legislature can also reverse the Court's erroneous decision here. This attempted reassurance fails to persuade for the same reasons as applied to the Council.

Footnote 9: The majority misunderstands my reliance on Braschi (74 NY2d 201). I discuss our precedent not because it compels a specific result in our interpretation of "marital status," but rather because it is an example of how this Court has developed a workable standard based on the typical indicia of an unmarried intimate partnership. That standard may in turn be applied to claims under the Human Rights Laws (see majority op at 11-12).